102 So.2d 604 (1958)
The STATE of Florida ex rel. The FLORIDA BAR, Complainant,
v.
Glen L. CALHOON, Respondent.
Supreme Court of Florida.
May 7, 1958.
*605 Ralph R. Quillian, Hollywood, for The Florida Bar, complainant.
J.B. Patterson, Fort Lauderdale, for respondent.
THORNAL, Justice.
Respondent Calhoon, a member of The Florida Bar, petitions for review of a judgment of the Board of Governors of The Florida Bar finding him guilty of unprofessional conduct and ordering his disbarment.
The matter is before us for consideration on the appeal of the respondent for a more lenient penalty.
The factual situation giving rise to the matter is most unusual and so far as our research reveals is without precedent. Respondent Glen L. Calhoon together with another lawyer, Edward Edwards, had been in the practice a relatively short time when the acts hereafter described took place. It appears that they shared office space. Edwards had filed a complaint for the appointment of a receiver for certain property in Dade County. The matter was heard by Honorable Grady Crawford, Circuit Judge, who appointed the receiver. Calhoon became the attorney for the receiver. Edwards represented the plaintiffs in the proceeding.
About December 23, 1955, after the Judge had indicated his ideas with reference to fees for the receiver, for Edwards, and for Calhoon as attorney for the receiver, Edwards suggested that he could induce the Judge to allow larger fees but that in order to accomplish this result it would be necessary for him to give the Judge "a Christmas present" in the amount of two hundred fifty dollars. Thereupon the receiver paid to Edwards the sum of one thousand dollars, seven hundred and fifty dollars of which were to go to Edwards' fee, and two hundred fifty dollars ostensibly were to be delivered to the Judge.
As we shall see this was all a part of a scheme on the part of Edwards to extract an additional two hundred fifty dollars for himself and all of his representations with reference to the Circuit Judge were totally false. Nonetheless, at this point Calhoon believed the story and actually believed that the money would be turned over to the Circuit Judge.
The receivership matter continued on for a number of months. During this time the Circuit Judge entered certain orders which Calhoon considered to be adverse to certain claimants interested in the receivership. He apparently pondered the matter until it weighed heavily on his mind. Finally, on October 28, 1956, he directed a joint letter to Judge Crawford, Edwards and William B. Roman, an attorney who represented a bank which was seeking to press a claim against certain cash in the receivership. By this letter Calhoon advised the addressees that he was taking this course of action after careful thought. He notified *606 them that he was attaching a draft of a letter which he contemplated mailing out to twenty-one people interested in the receivership the following Monday unless by noon of that day the final decree which had been entered in the case should be amended in certain respects advantageous to the twenty-one people mentioned. He stipulated certain conditions with reference to Edwards as well as the bank client of Roman and then finally demanded also that he himself should be awarded additional compensation in the amount of fifteen hundred dollars. The letter addressed to the Judge and the other two men contains much more detail but the foregoing is the damaging sum of it.
The draft of the letter enclosed with the communication to the Judge was one which Calhoon threatened to mail to the twenty-one people interested in the receivership. This too is a long detailed communication but the sum and substance of it was that the Circuit Judge had been unfair to them, that he had abused his judicial authority to their prejudice and that he had accepted a bribe in the form of the "Christmas present" mentioned above in consideration of increased fees to all the parties handling the receivership.
When Judge Crawford reached his office the Monday morning following October 28, 1956, he found the letter addressed to him with the enclosed proposed letter to the parties involved in the litigation. Instead of communicating with Calhoon by noon as Calhoon had directed in the letter, the Judge immediately communicated with the Secretary of the Dade County Grand Jury and demanded an investigation. Apparently not having heard from the Judge, Calhoon mailed the twenty-one damaging letters accusing the Judge of dishonesty and specifically stating that he had accepted money in consideration for the entry of his orders in the pending litigation.
There was a thorough Grand Jury investigation. Edwards at first denied that he had ever made the statement with reference to Judge Crawford accepting the "Christmas present". He subsequently retracted his denial and admitted that he had falsely made this statement to Calhoon, to the receiver and to another lawyer all with the purpose of extracting out of the total fees allowed an extra two hundred fifty dollars for himself.
The prompt action of the Judge in reporting the matter to the Grand Jury brought the whole unfortunate affair to a focal point. The Grievance Committee of the Dade County Bar moved into action. By this time both Calhoon and Edwards had become thoroughly abject and repentant and testified fully before the Grievance Committee. It was obvious that Edwards had told a falsehood when he represented the necessity for taking a cash Christmas present to the Judge. On the other hand, when Calhoon wrote the letters he believed Edwards' statement to be true. Nevertheless, it will be recalled that Calhoon was not merely bringing to the attention of the Judge the fact that he had been charged with accepting money in consideration for an order awarding fees but in addition he used this accusation as a direct threat to attempt to compel the Judge to enter certain orders which he considered more favorable to the people in whom he was interested, as well as an order allowing him additional fees.
After the matter was heard by the Grievance Committee of the Eleventh Circuit Bar, it was reported by that agency to the Board of Governors of The Florida Bar with a recommendation that Edwards and Calhoon be suspended for a period of three years. The Board of Governors then filed its complaint against each of the lawyers and the matter was referred to a referee. The referee heard various witnesses, including the respondent, as well as numerous character witnesses who spoke in behalf of both lawyers. He also accepted in evidence a transcript of testimony given before the Grand Jury. The referee found that both lawyers had been guilty *607 of unprofessional conduct, that Edwards had violated Canons 1, 3, and 29, and Additional Rules Canons 2 and 27 of the Rules Governing the Conduct of Attorneys in Florida, 31 F.S.A. He found Calhoon was guilty of unprofessional conduct in violation of Canons 1, 3, and 29, and Additional Rules Canons 2 and 8 of the Rules Governing the Conduct of Attorneys in Florida. He recommended that each of the lawyers be suspended from the practice of law for a period of five years.
Upon consideration of the report of the referee, the Board of Governors of The Florida Bar approved his findings but rejected his recommendation and in lieu of suspension for a period of five years, the Board of Governors adjudged each of the lawyers guilty of unprofessional conduct and ordered them disbarred. Review of this order is now sought.
The respondent Calhoon contends that the punishment prescribed by the Board of Governors is unjust and unduly severe and requests this Court to reduce the penalty and modify the judgment.
Canon 1 of the Rules of Ethics Governing Attorneys reads as follows:
"1. The Duty of the Lawyer to the Courts.  It is the duty of the lawyer to maintain towards the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the person making them should be protected."
Canon 3 of the Rules of Ethics Governing Attorneys reads in part as follows:
"3. Attempts to Exert Personal Influence on the Court.  Marked attention and unusual hospitality on the part of a lawyer to a judge, uncalled for by the personal relations of the parties, subject both the judge and the lawyer to misconstructions of motive and should be avoided. A lawyer should not communicate or argue privately with the judge as to the merits of a pending cause, and he deserves rebuke and denunciation for any device or attempt to gain from a judge special personal consideration or favor."
Canon 29 of the Rules of Ethics Governing Attorneys reads in part as follows:
"29. * * * He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."
Canon 2 of the Additional Rules of Ethics Governing Attorneys reads as follows:
"2. To maintain the respect due to the judicial officers and the courts of justice, State or Federal, within the State of Florida."
Canon 8 of the Additional Rules of Ethics Governing Attorneys reads as follows:
"8. To refrain, except in open court or in the presence of opposing counsel, from arguing or discussing in person, by letter, or other communication, the merits of any case with any judge or court before whom such case is pending, unless a copy of such argument, discussion or communication be furnished to opposing counsel. In order that a proper respect for and consideration of the integrity and character of all courts may be had and promoted, the conduct forbidden by this rule is deemed unethical and improper."
*608 The last quoted Canon applies to Calhoon but was not applied to Edwards.
Canon 27 of the Additional Rules of Ethics Governing Attorneys reads as follows:
"27. Be guilty of any deceit or wilful misconduct in his profession."
The last quoted Canon was applied to Edwards but not to Calhoon.
In arguing for mitigation of punishment the attorney for Mr. Calhoon suggested at the Bar of this Court that we give consideration to the general community atmosphere regarding judges which allegedly prevailed in Dade County during 1955-1956 when the prescribed acts of misconduct occurred. If the respondent were a layman this element might properly enter into our deliberations. Not so with a lawyer. On the contrary it appears to us that if the Bench and Bar of the area were being assaulted from all angles, with or without justification, it would be the duty of the lawyer above all others to exercise every measure of care and caution to avoid creating any justification for the suspicions. We have on numerous occasions stated that by the very nature of his profession as well as the license under which he does business, more is expected of a lawyer than of a layman who is not invested with the high degree of responsibility and the many fiduciary relations imposed upon a member of the Bar. If there be any substance to the contention with reference to the attitude of the public during the period involved, we think the lawyers of the area were charged with an even greater measure of responsibility than is usual in order to re-establish public confidence in the legal profession and the administration of justice.
We have many times announced the proposition that a lawyer is an officer of the courts and as such is an essential component of the administration of justice. State ex rel. Florida Bar v. Murrell, Fla. 1954, 74 So.2d 221; State ex rel. Florida Bar v. Evans, Fla. 1957, 94 So.2d 730. This is the universal rule. 5 Am.Jur., Attorneys at Law, Sec. 6, p. 265.
Canons of professional ethics are promulgated to establish rules and standards of conduct for the guidance of lawyers and judges in their relationship with each other as well as in their dealings with the public.
The conclusion which we here reach takes cognizance of the proposition that a judge as a public official is neither sacrosanct nor immune to public criticism of his conduct in office. However, the administration of the judicial process as an institution of government is a sacred proceeding. Webster suggested that "Justice is the greatest interest of man." Washington himself while laboring as an architect of our governmental structure laid out the specification that "The administration of justice is the firmest pillar of government." This concept could be supported by corroborating evidence that has accumulated over the years.
Admitting, therefore, the human weaknesses of judges as individuals but affirming our belief in the essentiality of the chastity of the goddess of justice we are impelled to the inescapable notion that any conduct of a lawyer which brings into scorn and disrepute the administration of justice demands condemnation and the application of appropriate penalties.
It would be contrary to every democratic theorem to hold that a judge or a court is beyond bona fide comments and criticisms which do not exceed the bounds of decency and truth or which are not aimed at the destruction of public confidence in the judicial system as such. However, when the likely impairment of the administration of justice is the direct product of false and scandalous accusations then the rule is otherwise. 5 Am. Jur., Attorneys at Law, Sec. 266, p. 420.
*609 We do not lose sight of the fact that the respondent was relatively new in the practice, that he was a fine law student, that those who know him well (including a former Justice of this Court) endorse his character, integrity and profound sincerity. He served his country with courage in time of war. He has been a good husband and father and undoubtedly his family have shared with him the heart-aches and embarrassment that have accompanied his predicament. Finally, also the record supports the contention of his counsel that he is repentent and truly sorry for his misdoings. He has publicly apologized and manfully admitted the errors of his ways. We would be less than human were we to deny that these ameliorating circumstances weigh heavily on our deliberations in the direction of a more lenient judgment. In consideration of these factors we are herewith inclined to state that should respondent ever petition for reinstatement under the Rules, all of these elements plus his subsequent conduct might properly be given substantial weight.
We are presently confronted with the commission of an act  fraudulently conceived and boldly executed  that strikes at the very heart of our judicial system, the honesty and integrity of a judge. True, when respondent Calhoon leveled his blast he believed that his ammunition was sound. Nonetheless, he not only accused but he exploited the charges (which were actually false) in a fashion tantamount to an effort to extort from the Judge a decree favorable to those in whom he was interested, with the companion effort to extort an increase in his own fees. If such conduct were treated lightly or its iniquitous potentials disregarded in a beatific spirit the temple of justice would collapse in disrepute and the integrity of the courts would become as putty to be molded into distorted forms at the hands of designing lawyers and litigants.
This must not come about. In our view the only preventive that will deter those so minded, as well as adequately deal with those who have made the effort, is to prescribe the most severe punishment available in the exercise of our disciplinary discretion. If our judgment appears to lack aspects of mercy our response in justification simply is that the effect of a single act of the nature here involved can never be completely eradicated nor will the administration of justice in the affected area ever completely eliminate the scars. It must not happen again.
The judgment of the Board of Governors of The Florida Bar is affirmed and the name of the respondent Glen L. Calhoon is hereby stricken from the rolls of The Florida Bar.
It is so ordered.
TERRELL, C.J., and THOMAS and ROBERTS, JJ., concur.
DREW, J., concurs specially.
DREW, Justice (concurring specially).
The Integration Rule, Article XI, subd. 5(i), 31 F.S.A. sets forth the conditions under which a disbarred or suspended attorney may be reinstated and provides the procedure. The only manner in which an attorney who has been disbarred may again become a member of the profession is to make the showing required by the Integration Rule. On the other hand, an attorney who has been suspended is automatically restored to his former status upon the expiration of the period of time fixed in the order of suspension. On one day he is a suspended member of the Bar and on the next he is a member of that profession in good standing. His conduct in the interim, good or bad, is not taken into account. It is, therefore, my view that in those instances where the conduct of the attorney is of such gravity as to require a suspension for any considerable period of time, the interests of the public, the Bar and the attorney involved require that the order be one of disbarment rather than of suspension.
A disbarred attorney may apply within a reasonable time after the entry of the *610 order disbarring him for reinstatement; but the burden is cast upon him by the rule to make it appear that by his subsequent conduct he may properly again be clothed with the duties and responsibilities of a member of the profession. This burden is an incentive to a disbarred member to rectify his wrongs and to live a good and useful life in order to regain and recapture in the community the position of esteem and honor that he had lost by virtue of the disbarment. It is an incentive for him to re-gain his own self-respect, the reward being a return to the profession in which he is trained to serve and best qualified to earn a livelihood. On the contrary, a suspension for a long term, with the knowledge that at the end of that term he will again be a member of the profession, affords little incentive to rectify the course of conduct which resulted in his suspension.
It is, therefore, my view that in this case the judgment reached in the opinion by Mr. Justice THORNAL is clearly justified by the disclosures of the record and is a more appropriate punishment from the standpoint of the public, the profession and the attorney himself than a long suspension.