111 So.2d 427 (1959)
STATE of Florida ex rel. The FLORIDA BAR, Complainant,
v.
William B. DAWSON, III, Respondent.
Supreme Court of Florida.
April 29, 1959.
*428 Mark Hulsey, Jr., Jacksonville, for The Florida Bar, complainant.
Neal Evans, Jr., Jacksonville, for respondent.
THORNAL, Justice.
The respondent Dawson petitions for a review of a judgment of the Board of Governors of The Florida Bar disbarring him from the practice of law pursuant to the provisions of Article XI of the Integration Rule as adopted on December 6, 1955, 31 F.S.A.
We must determine whether the evidence supports the findings of the referee and the Board of Governors and if so whether the prescribed disciplinary order is too severe.
Early in 1957 the Grievance Committee of the Fourth Judicial Circuit instituted an investigation into the professional conduct of the respondent, a member of The Florida Bar. After extensive hearings the Circuit Grievance Committee reported to the Board of Governors that there was probable cause to believe that respondent was guilty of unprofessional conduct in certain stated particulars. The Florida Bar thereupon filed its complaint against Dawson charging him with violations of Canons 10, 11, 27, 28 and 42 of the Canons of Professional Ethics, 31 F.S.A., Rules 19, 20, 21 and 26 of the Additional Rules Governing the Conduct of Attorneys in Florida, 31 F.S.A., and Section 2 of Article XI of the Integration Rule of The Florida Bar. Specifically the respondent was charged with commission of the following breaches: (1) that he solicited professional employment through an intermediary in several instances between January 1, 1954 and March 30, 1957; (2) during the same period the respondent made agreements that he would bear all expenses in the event of no recovery in particular matters in consideration of his professional employment by the people involved; and *429 (3) that he commingled his own funds with the monies of his clients.
The matter was strenuously contested before the referee. In the ultimate, however, he found the respondent Dawson guilty on all three charges. He recommended that Dawson be suspended from the practice of law for a period of two years but that the imposition of the suspension be withheld during a period of three years probation subject to stated conditions. He also recommended that costs of the proceeding be assessed against the respondent. The Board of Governers approved the findings of the referee with reference to the guilt of the respondent on the charges of soliciting professional employment through an intermediary and purchasing an interest in the subject matter of litigation to be handled by him. The finding of the referee regarding the commingling of funds was disapproved. The referee's recommendation of suspension to be withheld during a period of three years probation was disapproved. In lieu thereof the Board of Governors ordered the respondent disbarred. The respondent Dawson has now petitioned this court to review the judgment of the Board of Governors.
Dawson here contends that errors were committed by the referee in allowing into the record what he alleges to be hearsay evidence. He contends that the evidence before the referee was insufficient to support the conclusions reached. He pleads that he should not be subjected to any disciplinary action whatever.
The Florida Bar here contends that no improper evidence was allowed. It further asserts that the testimony before the referee adequately sustained his findings and that the judgment of the Board of Governors was justified.
The testimony reveals that Mr. Dawson graduated from law college in 1950. During the first year or two his practice was rather limited. In the third year he apparently became interested in specializing in negligence litigation, particularly in behalf of plaintiffs. He had for some time been acquainted with a photographer named Griffin. Mr. Griffin owned an automobile which was equipped with a police radio. It seems that the method of operation simply was that when Griffin heard of a tragic occurrence over his police radio or otherwise, he would hasten to the scene and make pictures. He sold the pictures to many members of the Bar. Included were a number of attorneys prominently identified with the defense of such litigation as well as known plaintiff specialists. Griffin also busied himself in the matter of interesting injured parties or the survivors of deceased persons in the matter of employing an attorney to represent them in pressing their claims arising out of alleged negligence. Although Mr. Griffin testified that he had recommended a number of lawyers including respondent Dawson, he was not able to state for the record the name of a single lawyer other than Dawson to whom he had referred negligence cases. He asserted that in each instance he never referred a potential plaintiff to Dawson unless his advice with reference to a good lawyer was requested. However, there was a substantial volume of testimony before the referee to the effect that Griffin pursued potential plaintiffs, suggested the advisability of employing an attorney and then recommended Mr. Dawson as a capable negligence lawyer. One witness stated that Griffin told him that if he hired Dawson the pictures taken at the scene would be made available to the lawyer free of cost.
The exhibits reveal numerous contracts of employment signed by clients whom Dawson had represented. Several of them were people who first heard of him through Griffin. The documents are far from models of professional draftsmanship. Many of them are written in longhand. Some of them were written in hospitals and various other places. Some of the contracts were signed by individuals on the very night of the death of some member of the family through a tragic occurrence. The contracts are written on bits of paper, *430 scratch pads, filing cards and correspondence stationery. This suggests that when they were prepared and signed, it was deemed advisable to have the agreements executed promptly in order to preclude the potential clients from changing their minds.
These agreements were usually in two paragraphs. The first stipulated that the client retained Dawson to represent him or her in connection with a certain accident. The second usually provided substantially as follows: "We will pay 40% of any recovery that we get for an attorney fees and in the event there is no recovery there shall be no costs to us." (Emphasis added.) In another type of contract the second paragraph reads substantially as follows: "We will pay 50% of any settlement that we get for attorneys fees provided we get our actual car damage and medical bill and in the event there is no settlement there shall be no costs to us." (Emphasis added.) Some of the witnesses testified that their agreement with Mr. Dawson simply was that if they were not successful in recovering anything, he would pay all of the costs of the litigation and would charge them no fees. Others testified that in addition to such considerations, Mr. Dawson guaranteed that at all events they would not have to pay any medical or automobile repair bills because if they were unsuccessful, he would pay them.
Mr. Dawson denies all of this, of course, but the evidence was before the referee who heard all of the witnesses and he was charged with the responsibility of evaluating their credibility and the weight of the evidence. Although the referee and the Board of Governors differ as to the measure of disciplinary action, they were in accord on the two basic findings regarding breaches of the Canons of Professional Ethics. We find nothing in the record that would justify us in disturbing the conclusions of the Board of Governors in this regard.
Referring to the contracts, Dawson contends here that the word "costs" refers to "attorneys fees". In other words, he says that his agreement was within permissible limits because all that it amounted to was an agreement to the effect that if there was no recovery, the clients would not be obligated for attorneys fees. While it may be true that the word "costs" when placed in the context of these contracts would include "attorneys fees," we think it also is much broader and more comprehensive than respondent would have us conclude. We think it includes not only attorneys fees but also the costs and expenses incident to the conduct of the litigation. This would mean court costs, sheriff fees, costs of depositions, investigations and other expenses which usually accompany litigation of this kind. We think this record certainly sustains the conclusion that Mr. Dawson was entering into agreements with clients in which he agreed to bear all of the costs in the event of no recovery as an inducement to professional employment. Attracting business through such negotiations is contrary to the Canons of Ethics.
As to the other type of contract, the record reveals instances where Mr. Dawson advanced to clients various sums for funeral expenses and other bills pursuant to an arrangement agreed upon at the time of employment. These agreements to advance funds for medical and automobile repair bills were also employed as inducements to potential clients to employ the respondent professionally. We are not here holding that, once legitimately employed, a lawyer is precluded from advancing sums incidental to the conduct of the client's business provided that promises of such advance were not conditions to obtaining employment. The course followed by Mr. Dawson was nothing more than buying a client's business by agreeing in advance to pay his bills.
Respondent contends that certain testimony before the referee was hearsay and should have been excluded. This testimony dealt primarily with conversations between Griffin and various individuals who subsequently employed Dawson as their lawyer *431 pursuant to Griffin's recommendations. We do not deem it necessary to explore the possible relationship of principal and agent between Dawson and Griffin. The record does show that during the period under investigation Dawson paid out to Griffin substantial sums of money allegedly for pictures and for the conduct of investigations incidental to litigation. While Griffin was not on a regular salary basis, it is agreed that his monthly receipts from Dawson would vary from two to three hundred dollars and sometimes more.
The rule is that in disciplinary proceedings the referee is not bound by technical rules of evidence. Drinker on Legal Ethics, p. 36; Matter of Santosuosso, 318 Mass. 489, 62 N.E.2d 105, 161 A.L.R. 892; In re Durant, 80 Conn. 140, 67 A. 497. We take the view that a disciplinary proceeding under Article XI of the integration Rule is neither criminal nor civil in nature. It is not circumscribed by technical rules of evidence usually attendant on the trial of an action in the courts. It is more nearly in the nature of a quasi-judicial administrative hearing until it reaches this court for decision. There was no error in the rulings of the referee regarding the admissibility of evidence.
We have affirmed the conclusions of the Board of Governors which sustained the findings of the referee on the ethical misprisions described above. We now consider the claim that the offense does not justify the severity of the penalty prescribed by the Board of Governors or even the more lenient penalty prescribed by the referee.
We approach our consideration of this aspect of the problem duly impressed by a petition for leniency influenced by the petitioner's youth and relatively limited experience in the practice of law. We have also considered his protestations of innocence grounded on the contention that his conduct was inspired by humanitarian motives designed to make his expert services available to the poor, the ignorant and ill-informed. There is some suggestion that were it not for aggressive practitioners who engage in the conduct personified by the respondent many such people would fall prey to shrewd and alert lawyers and perhaps never have their claims effectively pressed. The respondents' self-asserted expertise in the art of winning negligence cases betrays his reliance on youthful inadequacy and inexperience. His net income from his law practice alone, which reached $49,000 in his seventh year out of law school, suggests that he was something less than a Robin Hood in his advocacy of the causes of the "halt, the lame and the blind".
This court has condemned the practice of ambulance chasing through the media of runners and touters. In similar fashion we have with equal emphasis condemned the practice of direct solicitation by a lawyer. We have classified both offenses as serious breaches of the Canons of Ethics demanding severe treatment of the offending lawyer. State ex rel. Florida Bar v. Murrell, Fla. 1954, 74 So.2d 221. The exact nature of the disciplinary action to be taken is a problem which must be resolved on the basis of the factual situation presented by each particular case. Smith v. State Bar of California, 211 Cal. 249, 294 P. 1057, 79 A.L.R. 393; State ex rel. Florida Bar v. Murrell, supra. We have said that definitive disbarment is an extreme measure which should be saved for the most serious breaches of discipline. As a matter of fact in many states complete disbarment is employed only in those cases which suggest that the offending lawyer is beyond rehabilitation or that his conduct has been so reprehensible that he should be permanently separated from the profession. We have not yet so construed the imposition of a sentence of disbarment in Florida although we have recognized its severity. State ex rel. Florida Bar v. Murrell, supra; State ex rel. Florida Bar v. Evans, Fla. 1957, 94 So.2d 730; State ex rel. Florida Bar v. Calhoun, Fla. 1958, 102 So.2d 604. Flagrant though they may be, we do not deem the violations here to be so heinous in nature as *432 to justify a judgment of disbarment. The record indicates that the respondent should be an apt subject for professional rehabilitation if he is of a mind to take advantage of his opportunities in this direction. At the same time the breaches of discipline here present are such that they require much more than a mere judicial "tap on the wrist." We think it inescapable from our study of this record that the respondent with his associate Griffin had perfected a rather efficient organization for the solicitation of negligence cases and the signing up of clients. Although we agree with Mr. Lincoln that "a lawyer's time and advice are his stock in trade" we do not conclude from this that the service of a good lawyer is something that can be found in a bargain basement or located on the shelves of a super market or traced through the want ad columns of the daily newspaper. Indeed Mr. Drinker in his splendid treatise on Legal Ethics suggests that the primary characteristics which distinguish the legal profession from a commercial enterprise are a duty of public service in which one may attain the highest eminence without making much money. It is a relationship as an officer of the court to the administration of justice which requires sincerity, integrity and reliability. It is a relationship to a client which demands the highest degree of fidelity. It is a relationship to one's colleagues characterized by candor, fairness and a positive unwillingness to resort to commercial business methods of advertising and making inroads on the practice of competitors by direct solicitations and through the media of compensated representatives. Drinker on Legal Ethics, p. 5. We have many times announced our conviction that a lawyer is charged with the great public responsibility of aiding in the administration of justice and as one court has so aptly said that a lawyer should view his work "not as mere money getting but as service of the highest order, not as a mere occupation but as a ministry". Hepp v. Petrie, 185 Wis. 350, 200 N.W. 857, 861.
With these precepts as our guide, we must determine the measure of discipline which will be fair to this respondent but which will be designed to correct the offensive tendencies which he has heretofore demonstrated as well as of sufficient severity to deter others who might be similarly minded. We have stated that under the circumstances here shown the offense in our view does not justify the application of the aspect of permanency ordinarily attaching to a judgment of disbarment. At the same time the offense is much too serious for a mere reprimand or period of probation. We think suspension is in order but it should be for an indeterminate period to enable the offending respondent to demonstrate by his attitude and conduct his entitlement to return to the select circle of the ethical practitioners. During that period he should so conduct himself as to suggest that he will not again likely engage in the practice condemned by the Canons of Ethics and this opinion.
It is therefore the conclusion of this court that the judgment of disbarment be not approved. In lieu thereof the respondent William B. Dawson, III shall be and he is hereby suspended from the practice of law for a period of 18 months from the filing of this opinion and continuously thereafter until he shall have paid the costs of this proceeding in the amount of $871.03, and further thereafter until, in accord with Article XI(i) of the Integration Rule, he shall demonstrate to the Board of Governors and this Court that he is entitled to be reinstated in the practice of law upon making a showing required by the last-cited rule. Respondent shall not be entitled to apply for reinstatement until at least 18 months from the filing of this opinion. Until reinstated by order of this Court the respondent shall not directly or indirectly engage in the practice of law.
It is so ordered.
TERRELL, C.J., and THOMAS, HOBSON and O'CONNELL, JJ., concur.