THORNAL, Justice.
Respondent Rhubottom, a member of The Florida Bar, seeks review and reversal of a. judgment of the Board of Governors finding him guilty of unprofessional conduct and prescribing certain disciplinary measures.
We are called upon to consider the evidence and to determine whether the lawyer has committed violations of the Canons of Ethics.
Andrew L. Rhubottom graduated from law college and was admitted to the practice of law in Florida in 1955. Among his early clients was a Mrs. Mabel S. Wood, who was approximately seventy-eight years of age when Rhubottom initiated a series of transactions which contributed to his present predicament. Mrs. Wood apparently was a lady of some considerable financial resources. At the same time, Rhu-bottom was employed as an attorney for Hester Ringling Sanford and her two sons, Stuart Gage Lancaster and Charles Ringling Lancaster. These clients seem to have been members of the Ringling Circus family and the lawyer was emplojred to bring an action against certain trustees then operating the Ringling Bros. - Barnum & Bailey Circus. The litigation was complicated and extended over a considerable period of time. The amount of money potentially involved is not revealed by the record, but it appears to have been quite substantial, inasmuch as Rhubottom had visions of earning an attorney’s fee in the vicinity of $600,000. This rosy prospect occurring so early in his professional career apparently created tinseled visions of grandeur and affluence which were not justified by the actual balance in Rhubot-tom’s bank account. He proceeded to acquire an automobile, boat, and airplane, as well as an elaborate residence which he testified had a value of approximately $55,000.
Mrs. Sanford owned a residence of substantial value, however, she apparently was short of cash and lacked the money either to finance the expensive litigation or to maintain herself. Although the lawyer made no commitment in advance to finance the litigation as an inducement to his employment, it will be seen that in order to pay the expenses of the litigation, and likewise to keep his client contented, he *397 became involved in a series of financial transactions which produced his professional embarrassment.
In the early part of 1958, Mrs. Sanford and her sons did not have the cash to pay the costs of the litigation, or fees to their lawyer. Rhubottom who had had previous financial dealings with his client Mrs. Wood, thereupon approached her about a loan of $10,000. As mentioned above, Mrs. Wood, at the time, was approximately seventy-eight years of age. However, the referee commented that she was a well-preserved, mentally alert and intelligent lady. She agreed to lend her lawyer the $10,000 but told him that she wanted some document to indicate that she would be repaid. The evidence which her lawyer gave to her was a $10,000 note, signed by him alone. It contained a provision that he would secure a second mortgage on the homeplace of Mrs. Sanford. This he agreed would be “expeditiously obtained.” The $10,000 loan was used by Rhubottom to pay himself a fee of $4,350 owed by Mrs. Sanford and a son. He distributed approximately $4,500 to Mrs. Sanford for living expenses. The balance was used to pay expenses incident to the Ringling Circus litigation. Apparently, Rhubottom expected to obtain the second mortgage for the benefit of Mrs. Wood, but as we shall see, he never did so. On the contrary, he obtained the mortgage and used the proceeds for other purposes, including a substantial amount for himself.
While Rhubottom was borrowing the money from his elderly client, he was in the process of constructing the expensive home mentioned above. He was being pressed by creditors for payment of mater rials and labor in connection with the building. Some of his checks were outstanding and could not be honored because of lack of funds. Confronted by this predicament, Rhubottom then appealed to his other client, Mrs. Sanford. She executed in Rhubottom’s favor, a note secured by .a mortgage on the same homeplace which was to have been the security for the $10,000 loan made by Mrs. Wood. The note and mortgage signed by Mrs. Sanford was in the amount of $45,000. Rhubottom contacted one Greenhill, a member of the New York Bar, living in Miami, who arranged to sell the $45,000 note and mortgage at a discount price of $35,000. This was accomplished in August 1958. From the proceeds of this mortgage Greenhill •remitted to Rhubottom the sum of $19,495. Approximately $15,500 of this amount was on account of fees to Rhubottom authorized by Mrs. Sanford and sons. The balance was to pay expenses in the Sanford litigation. Rhubottom did not advise Mrs. Wood that he had obtained the second mortgage on Mrs. Sanford’s home nor that he had received money on the proceeds of the sale of the mortgage. Instead of using the money paid to him out of the mortgage proceeds to liquidate the debt to his client Mrs. Wood, the lawyer elected to use the money for his own personal benefit to pay creditors who were pressing him with bills for his new home. Mrs. Wood has never been paid any part of the $10,-000 loan.
In October, 1958, Rhubottom and his wife executed a promissory note in the amount of $12,000 in favor of Greenhill. This note was secured by a mortgage on an office building which Rhubottom owned. At the same time Rhubottom and wife executed two separate notes, each in the amount of $7,500, secured by a mortgage on their new home. This too was in favor of Greenhill. It was arranged that Green-hill would discount both of these mortgages for approximately $21,000 and remit the proceeds to Rhubottom. The record indicates that Greenhill sold the mortgages but remitted to Rhubottom only a small portion of the proceeds. He told Rhu-bottom that he had sent the remainder of the money to Mrs. Sanford and her son. On the basis of this statement Rhu-bottom testified before the Grievance Committee that this was a part of the money that had been expended . by him for the *398 living expenses of his clients. The exact amount contributed by Rhubottom for the living expenses of his clients over a period of about a year and a half is not clear from the record. However, it would involve thousands of dollars in addition to litigation expenses.
In addition to the foregoing, the respondent lawyer testified before the local Grievance Committee regarding a transaction with reference to a 90 day note which he was to obtain for Mrs. Wood and also with reference to the reasons why he had not had his wife join in the $10,000 note to Mrs. Wood. When he appeared before the referee Rhubottom’s testimony regarding these two matters was very much at variance with his testimony previously given before the Grievance Committee.
After hearing all of the witnesses who produced a record of testimony totaling 789 pages, the referee concluded that the lawyer had violated Article XI, Section 2 of the Integration Rule of The Florida Bar, 31 F.S.A., and also Canon 11 of the Code of Ethics governing attorneys and Rule 1 of the additional rules governing attorneys, 31 F.S.A. He concluded that Rhubottom was not guilty of purchasing an interest in litigation because he had the view that an agreement to do this must be made in advance of the employment in order to fall within the prohibitions of the Canons. The referee also concluded that the lawyer had given false testimony to the Grievance Committee. He recommended that Rhubottom be suspended from the practice of law for a period of twelve months and that following this period of suspension he be put on probation for a period of three years and that he pay all costs of the proceeding.
The Board of Governors, after reviewing the record, approved the factual findings of the referee and adopted his conclusions, except to the extent that the Board held Rhubottom not guilty of violating Rule 1 of the additional rules, but they did find him guilty of a violation of Canon 11, and Article XI, Section 2 of the Integration Rule. They also found that the respondent was guilty of a violation of Canon 42 of the Canons of Professional Ethics governing the advance of money to pay litigation expenses. As a disciplinary measure the Board of Governors prescribed that Rhubottom be suspended from the practice of law for a period of twelve months from the date their judgment becomes final and thereafter until he can show to the Board of Governors and this Court, pursuant to Article XI, Section S (i), Integration Rule, that he has been fully rehabilitated and until he has paid the costs of the disciplinary proceeding. The respondent asks us to reverse the judgment of the Board of Governors and find him guiltless of any unprofessional conduct.
There is little which we can add to that which has already been written by this Court regarding the responsibility which a lawyer carries in his dealings with his clients. While business transactions between lawyers and clients are not prohibited by the Canons of Ethics, nevertheless they will be meticulously scrutinized when alleged to have been unfair. Some Courts hold dealings such as those in the instant case, to be presumptively fraudulent and they place the burden on the lawyer to prove complete good faith and the total absence of fraud or overreaching. Halstead v. Florence Citrus Growers' Ass’n, 104 Fla. 21, 139 So. 132; 7 C.J.S. Attorney and Client § 127, p. 963 et seq.
We are once again confronted by the tragedy of a young lawyer excessively ambitious to acquire money and material benefits to the disregard of the ethics and integrity which should be the foremost characteristics of a member of the Bar. In recent years, we have seen these tragedies repeated with appalling frequency. We have said before, State of Florida ex rel. Florida Bar v. Dawson, Fla., 111 So.2d 427, that we are not particularly impressed *399 by appeals for leniency based on youth when it is perfectly obvious that the lawyer well knew of his wrongdoings and proceeded willfully in flagrant violation of the Canons of Ethics merely because of an uncontrollable ambition to get rich quick at the expense of his clients and the public generally. The education which a lawyer receives in these days is such that by the time he is admitted to practice he should be thoroughly familiar with the Canons of Ethics. They should constitute his professional bible. He ought to be thoroughly aware of the pitfalls involved in willful violations of the Canons. There is no justification for relinquishing the requirements of integrity and ethical conduct merely because the offending lawyer is in the early years of his practice.
In the instant case, Mr. Rhubottom obviously took advantage of his relationship with his elderly client Mrs. Wood. He exploited her confidence in him to obtain money for himself and in an obvious effort to provide for his other clients in the hope that the choice morsel of circus litigation could be retained and continued. In addition, when he had an opportunity to protect his client, Mrs. Wood, he again ex-ploted the chance to his own benefit and to the neglect and disregard of his client.
We disagree with the .referee and we agree with the Board of Governors that while it does not appear that Mr. Rhubottom used his agreement to obtain money for the benefit of Mrs. Sanford as an inducement to obtaining professional employment, the fact remains that large sums were advanced by him, both for litigation expenses and living expenses. We did say in State v. Dawson, supra, that a lawyer is not prohibited from a good faith advance of expenses in the course of litigation as a matter of convenience. However, this does not contemplate the investment of large sums of money both in litigation costs and living costs for the client for the purpose of preserving professional employment. We can detect little difference between promising money to get a client and paying out huge sums to retain one. It is perfectly clear that Mr. Rhu-bottom far exceeded the authorization of the Canons which permits incidental payment of a part of the costs of litigation as a matter of convenience.
We have examined the record with reference to the inconsistencies in the lawyer’s testimony before the local Grievance Committee and subsequently before the referee. We think there the referee was correct in his conclusion that there had been a willful falsification of the testimony before the Grievance Committee.
The judgment of the Board of Governors is approved. The .respondent Andrew L. Rhubottom is hereby suspended from the practice of law for a period of twelve months from the filing of this opinion and continuously thereafter until he shall have paid the costs of this proceeding in the amount of $818.76, and further, thereafter until in accord with Article XI, Section 5 (i) of the Integration Rule he shall demonstrate to the Board of Governors and to this Court that he is entitled to be reinstated in the practice of law upon making a showing required by the last cited rule. As a condition to reinstatement, the respondent shall either make .restitution for the amount of the $10,000 loaned to him by Mrs. Wood, or in the alternative, exhibit written evidence that the matter has otherwise been concluded satisfactorily. Respondent shall not be entitled to apply for reinstatement for at least twelve months from the filing of this opinion. Until he is reinstated by order of this Court, respondent shall not directly or indirectly engage in the practice of law.
It is so ordered.
ROBERTS, C. J., and THOMAS, DREW and O’CONNELL, JJ., concur.