PER CURIAM.
Pursuant to investigation, the Grievance Committee of the Twelfth Judicial Circuit on or about November 25, 1960, filed complaint in three counts against John M. Plathaway of Punta Gorda charging him with unprofessional conduct.
Honorable Warren M. Goodrich of Brad-enton was appointed referee and Honorable Thomas F. Icard of Sarasota was appointed to represent The Florida Bar. The referee held a hearing June 13 and 14, 1961, at Punta Gorda, Florida. The attorney for The Florida Bar, respondent and his counsel, with witnesses for both parties appeared.
On consideration of the charges and the evidence the referee exonerated Hathaway as to count two of the complaint and The Florida Bar abandoned that count. As to counts one and three the referee filed a report wherein, among other things, he found Plathaway guilty of the charges and recommended that he be suspended from the practice of law for a period of two years. On review of the referee’s report and recommendations the Board of Governors of The Florida Bar agreed with the finding of guilt on the part of the referee but in place of suspension for two years, it recommended that Hathaway be disbarred from the practice of law and that the costs of *484 this proceeding be assessed against him in the sum of $593.90.
March 22, 1962, Hathaway filed his petition in this court seeking to review and reverse the judgment of the Board of Governors. The instant review is governed by Article XI, Integration Rule of The Florida Bar, 31 F.S.A. as it existed prior to the amendment thereof which is effective January 1, 1962, and which governs all disciplinary procedures “instituted on and after” said effective date.
There was a motion to dismiss the petition for review charging that it was not filed within 30 days but it appears that an extension was given respondent for filing the petition so we hold that it was filed on time.
Reverting to the merits of the cause, we are confronted with three questions but we think they may all be comprehended in the single question: Were the findings and recommendations of the Referee and the Board of Governors of The Florida Bar supported and justified by the law and the evidence ?
Count one in substance charges that respondent received certain moneys belonging to Charlotte Shell Corporation, his client; that said moneys were paid to him as attorney for his client by a debtor of the client, and that respondent failed to promptly account for said moneys to the client, but appropriated them to his own use.
As pointed out in count one, respondent’s client was Charlotte Shell Corporation, all the incorporators of which, except Francis Karns, of Punta Gorda, Florida, were residents of Minnesota. A companion corporation, known as Charlotte Machinery Corporation, was formed at the same time as Charlotte Shell Corporation with common stockholders. The home base of both corporations was Punta Gorda. Respondent was their Florida attorney and Plarold Pfeiffer of Olivia, Minnesota, was their Minnesota attorney. The money involved was $2,567.25. The referee, one of the fairest and most thorough in the preparation of his report we have found in a case like this, reviewed the evidence and from his findings we have the following brief statement of fact:
“(1) I find from the evidence that the Respondent, John Hathaway, on or about November 13, 1958, received the sum of $2,567.25, in the form of a check on the First National Bank of Tampa, Florida, by the West Coast Construction Company, payable to the order of John M. Plathaway, Attorney for Charlotte Shell Corporation; that on the said date the Respondent was acting as attorney for Charlotte Shell Corporation; that the said monies were the property of the Charlotte Shell Corporation and were known by the Respondent to be the property of the said corporation, and were received by the Respondent in a fiduciary capacity and impressed with the trust in favor of the Charlotte Shell Corporation; and that Respondent had both a legal and ethical duty to properly segregate, preserve, and account for the said funds to his client, the Charlotte Shell Corporation.
“(2) I find that on or about November 14, 1958, the said check was stamped ‘for deposit only Punta Gorda State Bank, John M. Hathaway, Attorney’ and was deposited to an account in the said bank used by the Respondent as his attorney’s account, and also used by him and his wife as a personal account; that the said deposit was not made by the Respondent personally but by one Diana Johnson, who was then an employee in the Respondent’s law office; that the said monies of Respondent’s said client were thusly co-mingled with his own business and personal funds; that in the weeks succeeding the co-mingling of the said funds the balance in the said account was less than the sum of $2,567.25 constituting a conversion of part of the said funds to the Respondent’s use in violation of *485 his duty to segregate and preserve the same.”
Following this factual statement the referee’s report contains a series of statements as to how respondent handled these funds, the most of which he [referee] did not believe was the result of any intentional wrongdoing on the part of Hathaway but rather was caused by the negligent, confused and careless manner in which respondent conducted his office and his business. The report points out the manner in which respondent’s carelessness and negligence violated Canon 11, Section 1 of Rule B, and Rule 1 of Section 2 of Rule B, Code of Ethics, 31 F.S.A. On this point the report concludes with the following finding:
“(5) * * * Accepting Respondent’s testimony in its most favorable light, the inescapable conclusion remains that the Respondent was guilty of willful negligence, for a period of at least six months, in failing and refusing to account to his client for the said fiduciary funds, and I so find.”
For this disobedience to trust the referee recommended stern disciplinary action less than disbarment.
Since count two of the complaint was abandoned by the complainant because of insufficient evidence to support the allegations of said count, it will not be discussed here.
Count three of the complaint charges in substance that respondent “appropriated to his own use” substantial sums of money belonging to an estate of which he was the executor and attorney, and further that he failed to render accountings of the funds and affairs of said estate though frequently requested to do so.
The evidence, as summarized by the referee, shows that in June 1956 respondent was appointed executor of the will of William H. Sheldon; that the record in the probate court’s office reveals an inventory filed in August 1956 showing assets of the estate in the sum of $45,852.32; that between July 20, 1956, and December 23, 1957, respondent drew checks as executor of said estate and deposited them in a Punta Gorda bank, payable to himself. There were twelve of said checks ranging in amounts from $173 to $5,083, totalling in all $23,406. There was no court order or other approval of these disbursements. Said checks were deposited by respondent to the account of himself and his wife jointly. They were used by respondent and his wife to pay business and personal bills. Said checks were not disputed; in fact, were stipulated by respondent. In addition, pursuant to court order, two checks in the amount of $1,274-84 each, one marked “Executor fee” and the other marked “Attorney fee” were drawn by respondent in 1959 on the same account. There is no question that respondent transferred this sum from the estate to his personal account, and thereby transferred funds of the estate to his own use. Respondent admits that the balance in his personal and business account was often less than the moneys belonging to the estate.
The record in the probate court’s office shows in January 1959 a beneficiary of the estate filed petition to require respondent as executor to pay her bequest. This petition called attention to the fact that no accounting of the estate’s assets had been made since the original inventory. Several other petitions were filed for settlement of bequests and for other purposes pertaining to the estate. Finally the probate judge required respondent to show cause why such bequests had not been granted and other demands on respondent had not been met. On the date so designated respondent answered alleging that the estate was complicated, that the matters had not been brought to his attention by his office, that he was a member of the legislature and had been very busy and asked for a time extension to answer. Several time extensions were granted and respondent delayed for various and sundry reasons. Finally on November 9, 1959, the county judge *486 demanded of respondent that he file in his office within one week a complete accounting of the assets of the estate showing all disbursements and receipts supported by vouchers, as required by law.
The referee’s report further stated that the evidence shows that very soon after respondent qualified as executor he cashed about $16,000 in bonds belonging to the estate and by the end of September a few months later had appropriated at least $9,000 of said funds to his personal use. No substantial reason was given for cashing said bonds and the time for distribution was not at hand. Asked why so much of the estate funds had been transferred to his personal account, respondent’s reply was that his office was run in such a “confused manner,” that he was busy at other things, that he would sign checks without looking at them, some of which were blank checks but he was vague as to how so much money could have gone into his personal account without his notice. Respondent stated that he told everyone in his office that no moneys should be taken from the estate without an order; that he thereafter went ahead and signed other checks against the estate to his personal account without court order in the approximate sum of $20,000. No reason was given for this except his office was “highly confused at the time.” The accounting ultimately filed, said the referee, was mathematically correct but difficult to decipher, though it appears that at the time of these proceedings full restitution had been made to the estate for the funds appropriated in so far as the accounting can be understood. This is in part explained by the showing from the record that on March 6, 1959, in order to balance the Sheldon Estate respondent deposited $16,229.61 of his personal funds to its credit. The referee’s report of the evidence points out numerous other findings that reveal a careless disregard of legal requirements and customs for handling the affairs and the administration of an estate. On the basis of these facts, the referee made the following findings of fact as to count three:
“The evidence has been carefully examined, and all explanations of the Respondent concerning the appropriation of this substantial sum of money belonging to an estate has been studied, and the position of the Respondent that this sum of money came into his personal account, and was spent by him, without his knowledge, I do not find credible. Taking the statements of the Respondent that his office was confused and that he was busy and distraught, and giving him full benefit of the doubt, there is nothing in the record to in any way mitigate the circumstances or justify any conclusion other than that the Respondent willfully and deliberately appropriated and converted to his own use over $23,000.00 of the funds of an estate of which he was the duly appointed personal representative, and I so find.
“I further find that the Respondent failed and refused to account for his administration of the assets of the estate, until forced to do so by continuing legal pressure over a period of many long months. It is apparent that the excuses and delays of the Respondent in accounting for his administration of the estate lay in the simple fact that he had thereupon appropriated virtually all of the funds of the estate and could not account. I find from the record that the Respondent violated Canon 11 of Section 1 of Rule B, and Canon 1 of Section 2 of Rule B of the Code of Ethics and that he co-mingled the funds of a client with his own, failed to render true and correct accountings until forced to do so by legal action, and appropriated the monies of a client to his own use, until forced to make restitution by pressure brought to bear by judicial authority.”
*487 The foregoing findings of the referee as to counts one and three of the complaint have been checked with evidence in the record by this court and we find that every finding of the referee is amply supported by the evidence.
In making recommendations for disposition of this cause, the referee says that his “principal frustration”
“ * * * lies in the opinions of the Supreme Court of Florida in the cases of State of Florida ex rel. The Florida Bar v. Ruskin, 126 So.2d 142, and in the case of the State of Florida ex rel. The Florida Bar v. Frank R. Dunham, 134 So.2nd 1, particularly the latter. There is a strong conviction on the part of this Referee, arrived at with great reluctance because of the serious personal consequences to a brother lawyer, that the conduct of the Respondent has been such as to call for his disbarment. However, the opinions of the cited cases seem clearly to establish that the rule of law in this State is to the contrary, and it is the intention of the Referee to render a decision in conformity with the facts and the law. I can distinguish the case under consideration from the Dunham case only in the intangibles of the attitude of the respective Respondents, and since the attitude of this Respondent has certainly not been hostile or contemptuous, but has on the whole been cooperative, though vague, I cannot find that a more serious judgment should be entered against this Respondent because of such fine and difficult to judge distinction.”
Accordingly the referee recommended that respondent be suspended from the practice of law for a period of two years.
In State ex rel. The Florida Bar v. Dawson, Fla.1959, 111 So.2d 427, the Ruskin case, supra, and the Dunham case, supra, this court approved the rule of suspension from the practice of law for a definite period and continuously thereafter until he shall have paid the costs of the case, and further thereafter until in accord with Article XI, subd. 5(i), of the Integration Rule, he shall demonstrate to the Board of Governors and this court that he is entitled to be reinstated in the practice of law upon making a showing required by the last cited rule. Respondents in two of the above cited cases were not permitted to apply for reinstatement until at least a specified number of months from the filing of said opinions. Until reinstated by order of this court, the respondents were not to engage, directly or indirectly, in the practice of law.
The facts in these cases were similar in some respects but very different in others. They all had to do with misappropriated funds or misappropriated trust and confidence. Since the decision of these three cases, the court has followed this form of judgment in this type of disciplinary cases where suspension is awarded. In disciplinary proceedings when suspension from the practice of law is adjudicated to be the punishment and such suspension follows the pattern in the Dawson, Ruskin and Dunham cases, it necessarily follows that the former method of suspension for a definite period with automatic return to the practice of law when the time of suspension expires has no application in such cases.
In his examination of the Ruskin and Dunham decisions, supra, we think the referee overlooked this important difference in the manner of disposing of this type of case, which we have followed since the Dawson case. In our view the case at bar falls within the same category of cases as the Dawson case, the Ruskin case and the Dunham case.
Mr. Chief Justice Roberts, Mr. Justice Thomas, Mr. Justice Thornal and Mr. Justice O’Connell are of the view that pursuant to the rule followed in the cases just enumerated, respondent shall be, and he is hereby, suspended from the practice of law for a period of two years from the date of the filing of this opinion and continu *488 ously thereafter until he shall have paid the costs of this proceeding in the sum of $593.90, and further thereafter until, in accord with Rule 11.10 of Article XI, Integration Rule, he shall demonstrate to the Board of Governors and this court that he is entitled to he reinstated in the practice of law upon making a showing required by the last cited rule. Respondent shall not he entitled to apply for reinstatement until at least two years from the filing of this opinion. Until reinstated by order of this court, respondent shall not directly or indirectly engage in the practice of law.
It is so ordered.
ROBERTS, C. J., and THOMAS and O’CONNELL, JJ., concur.
THORNAL, J., concurs in judgment.
TERRELL, J., dissents.