**In the Matter of John DOE, Esquire.**

**No. CIV–90–1020–JB.**

United States District Court,
D. New Mexico.

Aug. 4, 1992.

R. Raymond Twohig, Virginia L. Ferrara, Albuquerque, N.M., for N.M. Disciplinary Bd.

Don Svet, U.S. Atty., Douglas C. Henson, Asst. U.S. Atty., Albuquerque, N.M., Jay B. Stephens, U.S. Atty., Washington, D.C., for John Doe.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

*[T]he profession of the law, in its nature the noblest and most beneficial to mankind, is in its abuse and abasement the most sordid and pernicious.*[1]

Law evolves with the collective experience of a society's efforts to peaceably resolve human conflict. Hence, law is not stagnant. Lawyers, in our adversary system, breathe life into its words. As they zealously advocate a client's interest, the law advances and, as they employ reason, they direct its movement. But, the law in this social order is not self-executing—the necessary instrument is the lawyer.

Today, it is beyond argument that one of the lawyer's most noble responsibilities is to protect the individual against Government excesses. Indeed, a lawyer's role is so essential to such vague concepts as "due process" and "equal protection of laws" that we guarantee the indigent a right to a lawyer. And although these concepts, so central to justice, are ultimately defined by the courts, they are first given substance by the lawyer.

When we hear the complaint, "it's not the law," the cry, "they're not following the law," or the clarion call, "there ought to be a law," we are jarred to the reality that our nation is a legal polity. Within this polity there is an increasingly palpable perception that the public is no longer empowered and that the legislature and executive are no longer responsive to its needs. It is not surprising, then, that the public turns to the remaining independent branch of Government—the judiciary—to vindicate its rights under the law. Again, it entreats the lawyer.

Acknowledging the crucial role of the lawyer in our nation's fabric, we must understand ethical standards are not merely a guide for the lawyer's conduct, but are an integral part of the administration of jus-

---

**1.** *People ex rel. Bulkley v. Salomon,* 184 Ill. 490, 501, 56 N.E. 815, 818–819 (1900) quoting Lord Bolingbroke.

tice. Recognizing a Government lawyer's role as a shepherd of justice, we must not forget that the authority of the Government lawyer does not arise from any *right* of the Government, but from *power* entrusted to the Government. When a Government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice. This alone compels the responsible and ethical exercise of this power.

For this reason, some observe that our system of law is a "tripartite entity"; that the process requires contending lawyers and a neutral trier; that if any of these three supports is missing, the process fails; and, that if any "leg" is disproportionately weak, the structure as a whole is weakened.[2]

Today, in the context of a disciplinary proceeding, the Government threatens the integrity of our tripartite structure by arguing its lawyers, in the course of enforcing the laws regulating public conduct, may disregard the laws regulating their own conduct. The irony of such an assertion not only fuels public discontent with our system of justice, but the insolence with which the Government promotes this as official policy irresponsibly compromises the very trust which empowers it to act. It falls to this Court to disabuse the Government of its novel self-conceived notion that Government lawyers, unlike any other lawyer, may act unethically.

This case, with its long and tortured procedural history, began when John Doe represented the United States in *United States v. Smith*, No. CR–F–9938–88, slip op. (S.C.D.C.1989). Between August 24, 1988 and December 8, 1988, John Doe allegedly communicated personally or through his detective with the defendant, Darryl Smith, after Mr. Smith was arrested and with full knowledge that Mr. Smith was represented by an attorney, Ms. Jaime S. Gardiner. While John Doe claims Mr. Smith initiated the conversations and volunteered information only after Mr. Smith was informed that Ms. Gardiner would not approve, John Doe admits he never sought nor received Ms. Gardiner's permission to speak with Mr. Smith.

Upon learning of the communications, Ms. Gardiner filed a motion to suppress. Although Judge Gladys Kessler on July 10, 1989 declined to suppress the evidence, she found John Doe violated Model Code of Professional Responsibility DR 7–104 (1980) ("DR 7–104"),[3] stating:

> While the violation of the Code of Professional Responsibility is painfully clear, a much more difficult issue is presented in regard to the appropriate sanction to be imposed....

> The Board of Professional Responsibility exists to handle cases involving Code violations and to impose appropriate disciplinary sanctions, and that institution is uniquely qualified to pass the ultimate judgment in this case....

*Smith*, No. CR–F–9938–88, slip op. at 22. Appropriately, Judge Kessler referred the matter to the District of Columbia's Disciplinary Board ("D.C. Disciplinary Board").

Since John Doe is only admitted to the New Mexico Bar and is permitted to practice as an Assistant United States Attorney ("AUSA") in Washington, D.C. solely by

---

**2.** L. Patterson and E. Cheatham, *The Profession of Law,* 111 (1971).

**3.** *D.C.'s Disciplinary Rule based upon DR 7–104(A)(1) provides:*

> During the course of his representation of a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has prior consent of the lawyer

representing such other party or is authorized by law to do so.

*New Mexico's Disciplinary Rule based upon Model Rules of Professional Conduct Rule 4.2 (1983) ("MR 4.2") provides:*

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

virtue of his New Mexico license,[4] the D.C. Disciplinary Board found it lacked jurisdiction to proceed against him. In doing so, however, the Board specifically "rejected entirely the suggestion that Disciplinary Rule 7–104(A)(1) does not apply to criminal proceedings, ... that the rule does not apply to criminal prosecutors performing their duties ... (and) that the Supremacy Clause of the United States Constitution creates a bar to the prosecution of an AUSA in a state disciplinary proceeding for a disciplinary violation." Petitioner's Exhibit C at 3. Accordingly, on May 14, 1990 the D.C. Disciplinary Board referred the matter to the New Mexico Disciplinary Board ("N.M. Disciplinary Board").

On August 22, 1990 John Doe removed the disciplinary proceeding to this Court and on October 29, 1990 the N.M. Disciplinary Board filed a motion to remand. On January 3, 1992 this Court heard oral arguments on the N.M. Disciplinary Board's motion and having made its findings and conclusions in open court, the Court found the N.M. Disciplinary Board's motion to remand was well taken and would be granted.

John Doe removed this case to federal court pursuant to 28 U.S.C. § 1442 (1973), entitled "Federal Officers sued or prosecuted," which provides:

> (a) A *civil action* or *criminal prosecution* commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) Any officer of the United States ... *for any act under color of such office* or on account of any right, title or authority claimed under any act of Congress for the apprehension and punishment of criminals.... (Emphasis added.)

Upon close review of the elements required under this statute, it becomes clear this matter was improvidently removed and this Court lacks jurisdiction. Accordingly, the appropriate forum for adjudicating this matter is the N.M. Disciplinary Board.

A. *Criminal prosecution or civil action*

■ Section 1442 permits removal of a *"civil action"* or *"criminal prosecution"* commenced against a federal officer. Therefore, the threshold question is whether a disciplinary proceeding, such as this, is a criminal prosecution or civil action.

John Doe argues section 1442 must be interpreted broadly to encompass many more proceedings than the terms civil and criminal traditionally bring to mind. Further, John Doe argues a disciplinary proceeding is "quasi-criminal" or "quasi-civil" and falls within the ambit of section 1442 regardless of whether state law designates the proceeding as *sui generis*.

The N.M. Disciplinary Board argues that since a disciplinary proceeding does not involve civil or criminal liability on the part of the attorney being reviewed, it is neither a civil action nor criminal prosecution. Moreover, the N.M. Disciplinary Board argues, federal courts have consistently deferred to the states on matters involving attorney discipline; therefore, a disciplinary proceeding is not the type of proceeding Congress contemplated to fall within section 1442.

Section 1442 clearly permits removal of cases "where federal officers are threatened with personal civil liability or criminal liability because of actions taken in pursuance of their federal duties," *Fountain Park Cooperative, Inc. v. Bank of America Nat. Trust & Sav. Ass'n*, 289 F.Supp. 150, 154 (C.D.Cal.1968), and is essentially "an attempt to protect federal officers from interference by hostile state courts." *Willingham v. Morgan*, 395 U.S. 402, 405, 89 S.Ct. 1813, 1815, 23 L.Ed.2d 396 (1969). Although section 1442 must be liberally construed to permit the federal government to act through its officers, this liberal construction must be tempered "with the highest regard for State's right to deal

---

**4.** John Doe is permitted to practice in all of the District of Columbia courts pursuant to 28 U.S.C. § 517 (1968).

with matters properly within its domain." *New Jersey v. Moriarity*, 268 F.Supp. 546, 555 (D.N.J.1967).

The Fourth Circuit in *Kolibash v. Committee on Legal Ethics of West Virginia Bar*, 872 F.2d 571 (4th Cir.1989), faced the similar task of determining whether a disciplinary proceeding is a civil action or criminal prosecution for the purposes of section 1442. In doing so, the court adopted the "functional test" used in *Volkswagen de Puerto Rico, Inc. v. Puerto Rico Labor Relations Bd.*, 454 F.2d 38, 43–45 (1st Cir. 1972).

In *Volkswagen*, the court addressed a separate element of 28 U.S.C. § 1441 (1973)[5], also present in section 1442, which requires the *forum* of the initial action to have been a "state court." Specifically, the court sought to determine whether the Puerto Rico Labor Relations Board constituted a "state court." Employing a functional test, the court determined the Board *functioned* as a court because it heard cases between two parties, acted upon a charge and directed a response, had rule making powers with an adjudicative format, and ordinarily adjudicated subject matter adjudicated by courts.

The court in *Kolibash*, in turn, applied the functional test to the separate element in section 1442 requiring the *subject matter* of the state court proceeding to be a civil action or criminal prosecution. In doing so, however, the *Kolibash* court evaluated the factors analyzed in *Volkswagen* to determine whether the forum, an administrative board, constituted a "state court" and stated:

The Committee on Legal Ethics is defined as an instrumentality of the West Virginia Supreme Court of Appeals and its procedures are adjudicatory in nature. The Committee is authorized to hold evidentiary hearings, subpoena witnesses, take testimony under oath in an adversary proceeding, *and otherwise conduct itself as a court.* It also makes factual findings and recommends attorney sanctions to the West Virginia Supreme Court of Appeals. A Committee investigation can result in public reprimands, suspensions, or disbarment of lawyers who practice in West Virginia. To hold this proceeding outside the removal statute would be to elevate form over substance. *If a state investigative body operates in an adjudicatory manner, and if a federal officer or his agent is subject to its processes, the statutory requirements of § 1442(a)(1) are satisfied.*

*Kolibash*, 872 F.2d at 576 (emphasis added). While the *Kolibash* court appropriately determined a disciplinary board was the type of *forum* which functioned as a "state court," the court did not address whether the *subject matter* of the state court proceeding was the type Congress intended to fall within the removal statute.[6] That is, the court should have determined the separate issue of whether, despite the name given to the proceeding, a disciplinary proceeding functioned as a civil action against or criminal prosecution of the federal officer.[7]

After employing the functional test in this case, it becomes clear that this disciplinary proceeding is neither a criminal

---

**5.** 28 U.S.C. § 1441(a) (1973) provides:
Except as otherwise expressly provided by the Act of Congress, any civil action brought in a *State court* of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. (Emphasis added.)

**6.** In this case, the parties do not dispute the N.M. Disciplinary Board functions as a court for purposes of section 1442. Accordingly, those cases cited by John Doe holding administrative

boards are appropriate *forums* for removal provide little assistance on whether the *subject matter* of a disciplinary proceeding is appropriate for removal.

**7.** For a criticism of the *Kolibash* opinion *see,* Cleckley, *Clearly Erroneous: The Fourth Circuit's Decision to Uphold Removal of a State Disciplinary Proceeding Under the Federal-Officer Removal Statute,* 92 W.Va.L.Rev. 577 (1990) *cited with approval,* Lidge III, *Government Civil Investigations and the Ethical Ban on Communications with Represented Parties,* 67 Ind.L.J. 549, 628 (1992).

prosecution of nor civil action against John Doe. "Disbarment and suspension proceedings are neither civil nor criminal in nature, but are special proceedings, *sui generis*, and result from the inherent power of courts over their officers. Such proceedings are not lawsuits between parties litigant, but rather are in nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice." *In re Echeles,* 430 F.2d 347, 349 (7th Cir. 1970), (citing *Ex Parte Wall,* 107 U.S. 265, 2 S.Ct. 569, 27 L.Ed. 552 (1883)). This interpretation is consistent with the approach taken by both federal and state courts[8] and those cases relied upon by John Doe, as in each case the federal officer stood to be liable civilly or criminally.[9]

A disciplinary proceeding does not function as a civil action because it does not involve two parties, one seeking damages or equitable relief from another. Unlike a civil action, a disciplinary proceeding is not maintained by a private individual as:

> [T]he complainant is not a real party to any action commenced by the disciplinary board. The purpose of attorney discipline is not to litigate any cause of action that someone may have against an attorney nor to provide personal remedies to complainants.... It is disciplinary counsel rather than the complainant who, in the final analysis, must make the determination whether there is probable cause to believe that an attorney's actions might be violative of a particular rule of the Code of Professional Responsibility.

*Matter of Nails,* 105 N.M. 89, 92, 728 P.2d 840, 843 (1986).[10]

Nor does a disciplinary proceeding function as a criminal prosecution since punishment of an attorney is not the goal of the disciplinary process, *In re Hartley,* 107 N.M. 376, 377, 758 P.2d 790, 791 (1988),[11]

8. For federal cases *see, Razatos v. Colorado Supreme Court,* 746 F.2d 1429, 1435 (10th Cir. 1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); *Standing Comm. on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir. 1984), *appeal dismissed, cert. denied,* 469 U.S. 1081, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984); *Mattice v. Meyer,* 353 F.2d 316, 319 (8th Cir.1965).

For state cases *see, In re McKay,* 280 Ala. 174, 180, 191 So.2d 1, 7 (1966) (per curiam); *In re Mackay,* 416 P.2d 823, 838 (Alaska 1966), *cert. denied,* 384 U.S. 1003, 86 S.Ct. 1907, 16 L.Ed.2d 1016 (1966), *reh. den.* 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966); *Yokozeki v. State Bar of California,* 11 Cal.3d 436, 447, 113 Cal.Rptr. 602, 609, 521 P.2d 858, 865, *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145 (1974); *State v. Peck,* 88 Conn. 447, 452–53, 91 A. 274, 276 (1914); *State ex rel. Florida Bar v. Dawson,* 111 So.2d 427, 431 (Fla.1959); *In re Moore,* 453 N.E.2d 971, 973 (Ind.1983) (per curiam); *In re Czachorski,* 41 Ill.2d 549, 554, 244 N.E.2d 164, 167 (1969); *State v. Scott,* 230 Kan. 564, 566, 639 P.2d 1131, 1134 (1982) (per curiam); *Anne Arundel County Bar Ass'n v. Collins,* 272 Md. 578, 582–83, 325 A.2d 724, 727 (1974); *Bar Ass'n of Boston v. Casey,* 211 Mass. 187, 191–93, 97 N.E. 751, 753–54 (1912); *In re Rerat,* 232 Minn. 1, 4–5, 44 N.W.2d 273, 274–75 (1950); *In re Mills,* 539 S.W.2d 447, 450 (Mo.1976) (en banc); *State v. Merski,* 121 N.H. 901, 909, 437 A.2d 710, 714–15 (1981) (per curiam), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *In re Logan,* 70 N.J. 222, 227, 358 A.2d 787, 790 (1976) (per curiam); *Ohio State Bar Ass'n v. Illman,* 45 Ohio St.2d 159, 161–62, 342 N.E.2d 688, 690 (per curiam), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *In re Evinger,* 604 P.2d 844, 845 (Okla.1979); *In re Holman,* 297 Or. 36, 682 P.2d 243, 260 (1984) (per curiam); *In re Kunkle,* 88 S.D. 269, 280, 218 N.W.2d 521, 527, *cert. denied,* 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974); *Memphis & Shelby County Bar Ass'n v. Vick,* 40 Tenn.App. 206, 213–14, 290 S.W.2d 871, 875 (1955), *cert. denied,* 352 U.S. 975, 77 S.Ct. 372, 1 L.Ed.2d 328 (1957); *In re Sherman,* 58 Wash.2d 1, 8, 354 P.2d 888, 891 (1960) (per curiam).

9. *Wisconsin v. Schaffer,* 565 F.2d 961 (7th Cir. 1977) (federal officer found in contempt stood to be subject to either civil or criminal liability); *North Carolina v. Carr,* 386 F.2d 129 (4th Cir. 1967) (same); *United States v. Pennsylvania Environmental Hearing Bd.,* 377 F.Supp. 545 (M.D.Pa.1974) (administrative hearing where officer stood to be subject to civil liability).

10. *See also, Mattice v. Meyer,* 353 F.2d at 318; *Ramos Colon v. United States Attorney,* 576 F.2d 1, 5–6 (1st Cir.1978); *Application of Phillips,* 510 F.2d 126 (2d Cir.1975) (per curiam); *State v. Peck,* 88 Conn. at 452, 91 A. 274.

11. *See also, In re Roth,* 105 N.M. 255, 256, 731 P.2d 951, 952 (1987) and *In re Martinez,* 104 N.M. 152, 153, 717 P.2d 1121, 1122 (1986); *Committee on Legal Ethics of West Virginia State Bar*

and it is not an action commenced by the state to redress criminal wrongs by imposing sentences of imprisonment. *In re Daley,* 549 F.2d 469, 475 (7th Cir.1977), *cert. denied* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977).

This conclusion is also specifically supported by the Preamble to the Model Rules of Professional Conduct which provides:

> Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process....
>
> Violation of a rule *should not* give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. *They are not designed to be a basis for civil liability.* Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. *The fact that a rule is a just basis for a lawyer's self assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.* (Emphasis added.)

Finally, this result comports with the deference federal courts accord states to admit or discipline the attorneys they choose to license.

---

*v. Mullins,* 159 W.Va. 647, 651, 226 S.E.2d, 427, 429 (1976); *Committee on Legal Ethics of West Virginia State Bar v. Graziani,* 157 W.Va. 167, 171–172, 200 S.E.2d 353, 355 (1973) *cert. denied* 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974).

**12.** *See also, In re Lockwood,* 154 U.S. 116, 118, 14 S.Ct. 1082, 1083, 38 L.Ed. 929 (1894); *In re Summers,* 325 U.S. 561, 570–571, 65 S.Ct. 1307, 1312–1313, 89 L.Ed. 1795 (1945); *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444 (1978); *Middlesex County Ethics Committee v. Garden State Bar Assn.,* 457 U.S. 423, 432–34, 102 S.Ct. 2515,

Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct. They are also responsible for the discipline of lawyers.

*Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (per curiam).[12] In light of the regulatory function of a disciplinary proceeding which federal courts have consistently left in state hands, the Court finds this disciplinary proceeding is not a "civil action" against nor a "criminal prosecution" of John Doe.

### B. *Color of Federal Office*

◼ In order to remove an action pursuant to section 1442, the movant must also allege his federal office entitles him to a colorable federal defense. *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). John Doe asserts the Supremacy Clause of the United States Constitution, federal law authorizing him to communicate with a represented party, and prosecutorial immunity require the disciplinary proceeding to be heard in federal court. While John Doe argues these are *colorable* federal defenses, they are not supported by law.

### 1. Supremacy Clause

◼ First, John Doe asserts the Supremacy Clause of the United States Constitution precludes states from enforcing varying ethical rules which are inconsistent with a federal prosecutor's duties. Fur-

---

2521–22, 73 L.Ed.2d 116 (1982); *Doe v. Board on Professional Responsibility of District of Columbia Court of Appeals,* 717 F.2d 1424, 1428 (D.C.Cir.1983); *In re Abrams,* 521 F.2d 1094 (3d Cir.), *cert. denied,* 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975); *Saier v. State Bar of Michigan,* 293 F.2d 756, 759 (6th Cir.1961), *cert. denied,* 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961); *In re Allred,* 108 N.M. 666, 777 P.2d 905 (1989); *In re Klipstine,* 108 N.M. 481, 775 P.2d 247 (1989); *Matter of Atencio,* 106 N.M. 334, 742 P.2d 1039 (1987); *In re Braverman,* 549 F.2d 913, 921 (4th Cir.1976); *In re Abrams,* 521 F.2d at 1105; *Selling v. Radford,* 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917).

ther, he argues federal prosecutors exercise extraordinarily important federal executive functions while investigating and prosecuting violations of law. While a state ethical rule may appropriately be enforced against a state prosecutor, it conflicts with a federal prosecutor's duties. Finally, John Doe concedes the rules of ethics may apply to federal prosecutors in some circumstances, but asserts the Department of Justice ("DOJ") is vested with the authority to determine when and how.

■ In order for a Supremacy Clause defense to arise in this case, there must be a conflict between a federal prosecutor's duties under federal law and his duties under state law. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). A conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*[13] Furthermore, when the state law sought to be preempted by federal law concerns matters traditionally within the realm of the states, the federal law must demonstrate a clear and manifest purpose to preempt the state law on that subject. *Id.* at 715, 105 S.Ct. at 2376.

In this case, John Doe's Supremacy Clause defense suffers from the false assumption that a prosecutor is under no duty to investigate criminal activity in an ethical manner. In fact, John Doe fails to provide the Court with any federal law

directly contradicting or demonstrating a clear and manifest purpose to preempt the application of state ethical codes to an AUSA. As Judge Marilyn H. Patel stated when she rejected an identical Supremacy Clause argument:

> This court has attempted without success to locate *any* authority for the proposition that DR 7–104 does not apply to a government attorney who communicates with a represented individual under indictment. This, of course, is not surprising in light of the tortured logic of the Attorney General's policy.
>
> *    *    *    *    *    *
>
> The ethical norm that an attorney should not communicate with a represented individual in the absence of that individual's attorney is longstanding ..., is widely accepted and the rule or its equivalent is now in effect in every state. The rule is designed both to protect the represented individual from overreaching opposing counsel and to ensure that the adverse party's attorney can function properly.

*United States v. Lopez*, 765 F.Supp. 1433, 1447–1449 (N.D.Cal.1991). This inability to find authority for John Doe's proposition is understandable, however, as the ban on communicating with a represented party is a fundamental principle of both state[14] and federal law,[15] is incorporated into federal law through the local rules,[16] and has its roots in our common law tradition.[17] Furthermore, the DOJ's *own* Standards of Conduct expressly import the provisions of the Code of Professional Responsibility.[18]

**13.** *See also,* Lidge III, *supra* at 622.

**14.** The predecessor to DR 7–104(A)(1), Canon 9 of the ABA Canons of Professional Ethics (1908), provided in relevant part, "[a] lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel."; *see also, Lopez,* 765 F.Supp. at 1447.

**15.** *United States v. Thomas,* 474 F.2d 110 (10th Cir.1973), *cert. denied* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Hammad,* 858 F.2d at 837; *United States v. Batchelor,* 484 F.Supp. 812 (E.D.Pa.1980); *compare United States v. Ryans,* 903 F.2d 731, 740

(10th Cir.1990) (court found DR 7–104(A)(1) did not apply when defendant "had not been charged, arrested or indicted or otherwise faced with the prosecutorial forces of organized society...." In this case, Mr. Smith had been arrested and released on his own recognizance pending further investigation).

**16.** *See* D.N.M. LR–CV 83.9; D.D.C. LR–CV 703(b), 706(a).

**17.** *See In re Oliver,* 2 Adm. & Eccl. 620, 111 Eng.Rep. 239 (1835) cited in Lidge III, *supra* at 558.

**18.** 28 C.F.R. § 45.735–1(c) provides: Department attorneys "should be guided in their conduct by the Code of Professional Responsibility of the American Bar Association."

In short, the ethical rules clearly apply to government lawyers and the courts and disciplinary authorities have not hesitated to discipline government lawyers who violate these rules. Lidge III, *supra* note 60 at 563–64.

■ Similarly, John Doe's argument that the DOJ is vested with the authority to interpret when and how the code of ethics applies to an AUSA fails. The idea of placing the discretion for a rule's interpretation and enforcement solely in the hands of those governed by it not only renders the rule meaningless, but the notion of such an idea coming from the country's highest law enforcement official displays an arrogant disregard for and irresponsibly undermines ethics in the legal profession.

As no law requires or even permits an AUSA to act unethically when conducting an investigation, the Court finds no violation of the Supremacy Clause.[19] Certainly, the mere fact that an AUSA is a *federal* lawyer does not increase the importance of his or her duties; *federal* public defenders or *federal* criminal defense lawyers play an equally vital function in our adversary system. As such, federal prosecutors are not only able to investigate criminal activity in an ethical manner; federal and state law mandate that they do so.

2. "Authorized by Law"

■ Second, John Doe claims he, as a federal prosecutor, has a duty to investigate criminal activity and, therefore, is "authorized by law" to ignore codes of ethics. As best can be discerned, John Doe's argument is rooted in 28 U.S.C. § 533 (1968) which provides:

The Attorney General may appoint officials—

(1) to detect and prosecute crimes against the United States;

\*    \*    \*    \*    \*    \*

(3) to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

He then claims the court in *United States v. Hammad,* 858 F.2d 834, 839 (2d Cir.1988) not only made it his prerogative to ignore ethical restrictions while investigating crime, but his responsibility to do so when it stated:

This Court has recognized that prosecutors have a responsibility to perform investigative as well as courtroom related duties in criminal matters.... As we see it, under DR 7–104(A)(1) a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal evidence against a suspect will frequently fall within the ambit of such authorization. (Citations omitted.)

Finally, he argues his conduct was authorized by directives to Department attorneys as summarized in Attorney General Thornburgh's June 8, 1989 memorandum ("Thornburgh memorandum"). *See* Petitioner's Exhibit E attached. In his memorandum, Attorney General Thornburgh concludes, "[i]n sum, it is the Department's position that contact with a represented individual in the course of authorized law enforcement activity does not violate DR 7–104. The Department will resist, on Supremacy Clause grounds, local attempts to curb legitimate federal law enforcement techniques." *Id.* at 7.

Both DR 7–104(A)(1) and its counterpart M.R. 4.2 allow communicating with a represented party when "authorized by law." As an exception to the general rule, however, "authorized by law" must be narrowly construed. *Lopez,* 765 F.Supp. at 1447; *see also,* Lidge III, *supra* note 111 at 573.

Were this Court to interpret the broad investigatory statement in 28 U.S.C. § 533 as authorizing one vested with investigative authority to ignore codes of ethics, it would not only be construing "authorized by law" broadly, but would be creating a blanket exemption from ethical obligations for nearly all of a prosecutor's functions. As Judge Patel stated in *Lopez,* 765 F.Supp. at 1448:

---

**19.** *See also* Jerry E. Norton, *Ethics and the At-* *torney General,* 74 Judicature 203 (1991).

Were this Court to accept the Department's argument in this regard, it is not clear that there would be any conduct the prosecutor could not undertake, as long as it was pursuant to his or her responsibility to investigate and prosecute crimes. DOJ attorneys would be exempt from rules adopted by federal courts to govern ethical conduct of attorneys practicing before them. This is, quite simply, an unacceptable result.... The Attorney General's "authorized by law" theory thus has no foundation. Indeed, there are compelling reasons why the ethical prohibition encompassed in Rule 2–100 and analogous ABA rules should apply to DOJ attorneys, at least in the post indictment context ... [I]n light of the prominent and unique role of the Department of Justice in this country's litigation, the suggestion that DOJ attorneys should be exempted from a longstanding and universally applied ethical norm is alarming.

Such a decision would not only affect prosecutors, but it is conceivable that any other agency vested with investigative authority would claim exemption from ethical codes in other contexts as well. *See NLRB v. Autotronics, Inc.*, 596 F.2d 322 (8th Cir. 1979) (where court voided settlement NLRB directly negotiated with employer despite general delegation of investigative duties to NLRB); *see also*, Lidge III, *supra* at 577–81.

The *Hammad* decision adds little more. Although the court in *Hammad* declined to suppress evidence resulting from the unethical behavior, the court specifically found the prosecutor was subject to the code of ethics and had, under the facts of that case, violated rule 7–104(A)(1). *Hammad*, 858 F.2d at 840. While the court in *Hammad* found suppression of evidence was not the appropriate remedy, it did not preclude holding the prosecutor accountable in a disciplinary proceeding.

■ Finally, Attorney General Thornburgh's memorandum by itself is not controlling law as it was issued after the alleged unethical conduct in this case and

was never adopted as law.[20] Indeed, shortly after the memorandum was issued, the American Bar Association soundly rejected this policy as "a unilateral assumption of authority to render self-interested interpretations of ethical standards, but also an unwarranted and unfounded use of executive power to create unequal classes of both litigants and lawyers." *See* Petitioner's Exhibit F at 3, American Bar Association Report to the House of Delegates (Feb. 12, 1990). Were this Court to recognize the memorandum as law, it would allow an agency to issue a regulation exempting itself from ethical restrictions in the absence of any delegated authority or congressional mandate to do so. *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979) (court stated that for a substantive regulation to have force and effect of law the regulation had to be rooted in a congressional grant of authority and had to conform to the procedural requirements imposed by Congress); *see also*, Lidge III, *supra* at 583–83. Such a result is clearly unacceptable.

It is understandable that an AUSA would construe the Thornburgh memorandum to permit or even mandate unethical behavior. But it is "alarming" that the principal law enforcement officer of this country would issue a memorandum purporting to authorize unethical behavior. Because this memorandum invites continuing unethical behavior, it must not be tolerated. ·

3. Prosecutorial Immunity

■ Third, John Doe claims he is entitled to prosecutorial immunity. In short, this argument contradicts the precedent granting such immunity and is not supported in the law.

Prosecutorial immunity is premised on the belief that disciplinary proceedings, rather than civil proceedings are the appropriate means of addressing the unethical conduct. In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the court observed that "a prosecutor stands

---

**20.** *Compare* Thornburgh opinion at 7 *with* 28 C.F.R. § 45.735–1.

perhaps unique among officials whose acts could deprive persons of constitutional rights in his [or her] amenability to professional discipline by an association of his [or her] peers." *Id.* at 429, 96 S.Ct. at 994.[21] Also, other courts, both federal and state, have consistently stated Government attorneys are not immune from state-bar disciplinary proceedings[22] and John Doe provides no authority to the contrary.

This Court need not address whether John Doe did in fact act unethically. These determinations are more appropriately reserved for the state bar, which implements procedures for testing both the moral and intellectual qualifications of the attorneys it chooses to license. John Doe has not alleged any reason why the N.M. Disciplinary Board would not act impartially in this proceeding nor that it has any interest in curtailing his legitimate activities as a federal prosecutor. Moreover, the Court finds that by remanding this case to the N.M. Disciplinary Board, it is ensuring consistency in disciplinary proceedings rather than inviting inconsistent rules of ethics. Once federal courts indulge in applying state codes of ethics differently to federal prosecutors, a double standard will inevitably arise causing confusion both among the legal community and those that rely on its integrity.

Harking back to the tripod model, it is instantly plain that the successful functioning of the adversary system depends upon the coordination of the roles of the prosecutor, the defender and the trier. Without the proper balancing of these roles, the structure fails.

During the long and deliberate process of conflict and resolution from which our system of law evolved, a system to secure fairness—ethics—has been forged. It prevents those advocates embroiled in the heated conflicts of the day from losing focus on the long-term direction and purpose of the law. Distracted by the battles of law enforcement today, however, the DOJ's sights have fallen short as it seeks to alter a longstanding axiom of ethics with origins in our common law tradition and which has been the stated policy of the United States Attorney's office for at least twenty-eight years. *Ricks v. United States*, 334 F.2d 964, 970 n. 18 (1964). It is difficult to accept that today there is a real need for federal prosecutors to behave in an unethical manner or that the federal prosecutors can no longer function, as they have until now, if required to adhere to the same ethical standards as other attorneys, most of whom seem able to efficiently represent their clients within the limits imposed by the Rules of Professional Conduct.

In holding to ethical standards, an attorney for the Government cannot be a mere minion of the Government. This brings to mind Chief Justice Warren E. Burger's observation that when lawyers subordinate themselves to the Government and conform their conduct to governmental policy, they are no longer free, but are reduced to vassals as in a totalitarian state.[23]

The lawyer must stand independently and resolutely when he or she believes the Government is wrong. And on occasion it requires enormous courage. History provides us many examples and the noblest of all is Sir Thomas More who rather than surrender his convictions as a lawyer forfeited not only his office as Lord Chancellor but his head.

Certainly, if permitted to act unethically any attorney could gain advantage over his or her adversary. But to prevail in litigation by unfair means not only rewards the unscrupulous but relegates justice to a hollow victory. This is exactly what the codes of ethics is designed to prevent. Before issuing his memorandum, Attorney General Thornburgh would have done well to have taken a few steps from his office to contemplate the inscription on the rotunda wall where it *is* cast in stone—"the United

21. *See also, Malley v. Briggs*, 475 U.S. 335, 343 n. 5, 106 S.Ct. 1092, 1097 n. 5, 89 L.Ed.2d 271 (1986); Cleckley, *supra* note 138 at 607.

22. *See* Cleckley, *supra* notes 138–139 at 607.

23. Justice Warren E. Burger, Delivery of Justice, 182 (1990).

States wins its case whenever justice is done one of its citizens in the courts."

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED, that the New Mexico Disciplinary Board's October 29, 1990 motion to remand this proceeding to Disciplinary Board of the New Mexico Supreme Court be, and hereby is, granted.

## EXHIBIT E

Office of the Attorney General

Washington, D.C. 20530

June 8, 1989

MEMORANDUM

TO: All Justice Department Litigators

FROM: Dick Thornburgh
       Attorney General

SUBJECT: Communication with Persons Represented By Counsel

Disciplinary Rule 7–104(A)(1) of the ABA Model Code of Professional Responsibility and its successor, Rule 4.2 of the ABA Model Rules of Professional Conduct, provide that a lawyer shall not communicate with a person represented by counsel on the subject of the representation, unless the lawyer has the consent of counsel or is "authorized by law" to do so.[1] These rules have in recent years been broadly interpreted by some defense counsel in an effort to prohibit communications by law enforcement personnel with the target of a criminal investigation, whether or not a constitutional right to counsel has attached. This expansive reading has been advanced in primarily two contexts, motions to suppress evidence developed through such contacts, and disciplinary pro-

ceedings against individual Justice Department attorneys at the state level. The effect of these efforts may someday be to achieve through DR 7–104 what cannot be achieved through the Constitution: a right to counsel at the investigative stage of a proceeding. As a practical matter these efforts threaten to become a substantial burden on the law enforcement process.

The issue has arisen, for the most part, in two general settings:

(a) instances of covert contacts with a suspect by undercover agents or informants, or (less frequently) overt interviews by investigators or attorneys, after the suspect has retained counsel; or

(b) instances of multiple representation, where a single attorney represents either several individuals (one of whom is the principal target and is paying for everyone's representation) or an organization and all its employees (when the organization is the target and is paying for the representation), and where the attorney insists that all contacts by prosecutors or agents must come through him, even if initiated by one of the "represented" individuals.

The Department has consistently supported and the courts have long recognized the legitimacy of undercover operations, even when they involve the investigation of individuals who keep an attorney on retainer. *See United States v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973) *cert. denied,* 415 U.S. 989 (1974); *United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986); *United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.), *cert. denied* 464 U.S. 852 (1983) 1; *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied* 453 U.S. 920

---

**1.** Disciplinary Rule 7–104(A)(1) provides:

    During the course of his representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

    Rule 4.2 of the ABA Model *Rules of Professional Conduct,* adopted by the House of Delegates of the ABA in August 1983, and amended in February 1987, provides with respect to *ex parte* contacts:

    In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

    A lawyer may not avoid the prohibition by making such a communication through an agent or investigator. *See* ABA Model Rule 8.4(a); *United States v. Partin,* 601 F.2d 1000 (9th Cir.1979); *United States v. Thomas,* 474 F.2d 110 (10th Cir.1973).

(1981); *cf. United States v. Vasquez*, 675 F.2d 16, 17 (2nd Cir.1983); *United States v. Jamil*, 707 F.2d 638 (2nd Cir.1984), *cert. denied* 469 U.S. 1161 (1985).

Further, it is clear that when an individual believes that his lawyer is representing not his own interests but the interests of a third party, and that announcing to his lawyer that he has made contact with government investigators could have dire consequences, the individual should not be channelled through the lawyer whom he believes is inimical to his interests. Sometimes, direct communications serve to benefit the client and to vindicate his rights. See *Wood v. Georgia*, 450 U.S. 261 (1981).

In ruling on a removal motion made by federal prosecutors in state disciplinary proceedings, the Fifth Circuit has recently observed "Regulation of the legal profession admittedly implicates significant state interests, but the federal interest in protecting federal officials in the performance of their federal duties is paramount." *Kolibash v. Committee on Legal Ethics*, No. 88-3871 (5th Cir. March 7, 1989) Slip Op. at 9. That court observed that the expansion of such disciplinary rules "could be used to interfere with the duties of federal officials, including the President of the United States, the Secretary of State, and the Attorney General of the United States, all of whom may be lawyers." *Kolibash* at 9. Indeed, the Department has consistently taken the position that the Supremacy Clause of the Constitution does not permit local and state rules to frustrate the lawful operation of the federal government. *See Ethical Restraints of the ABA Code of Professional Responsibility on Federal Criminal Investigations*, 4B Op. Off. of Legal Counsel 576, 601–02 (1980).

The Department has taken the position that, although the states have the authority to regulate the ethical conduct of attorneys admitted to practice before their courts, *Nix v. Whiteside*, 106 S.Ct. 988, 994 (1986), that authority permits regulation of federal attorneys only if the regulation does not conflict with the federal law or with the attorneys' federal responsibilities, *see Sperry v. Florida*, 373 U.S. 379, 402 (1963).

Notwithstanding the state of the law, the defense bar has continued to press its position that DR 7–104 does in fact limit the universe of appropriate federal investigative techniques. The high-water mark of the bar's litigative effort is the Second Circuit's first decision in *United States v. Hammad*, 846 F.2d 864 (2nd Cir.1988), later revised 858 F.2d 834 (2nd Cir., Sept. 23, 1988).

In its initial opinion on May 12, 1988, the court held that DR 7–104 applies to federal criminal investigations both before and after indictment, that a prosecutor violates the rule by using an informant to gather information from a suspect known to be represented by counsel, and that such a violation may lead to the suppression of any tainted evidence. Fortunately, the Second Circuit later revised its holding in *Hammad*, expressing concern that its original opinion might unduly hamper criminal investigations, particularly in those cases in which career criminals have attempted to immunize themselves by hiring "house counsel." Although the revised opinion still applies DR 7–104 to federal criminal investigations and is otherwise far from clear, it does conclude that under the rule:

a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization.

*Hammad*, 858 F.2d at 839.

Although *Hammad* no longer poses the same threat to federal law enforcement objectives that it once did, the case will still exacerbate the uncertainty felt by many government attorneys over what is appropriate conduct in this area. In addition, the case will almost certainly generate additional litigation both inside and outside the Second Circuit.

The conflict between the Department's law enforcement objectives and the expanding interpretation of DR 7–104 and Model Rule 4.2 is not confined to the area of

criminal law enforcement. The Department also has the statutory duty to investigate violations of certain civil statutes, and defense lawyers have attempted to use these same "ethical rules" to impede such investigations. The problem has commonly arisen in the context of the False Claims Act, which provides that the Attorney General "diligently shall investigate" violations of the Act. In cases involving allegations against corporations and other organizations, Civil Division attorneys have attempted to fulfill that duty by interviewing individual employees without contacting the company's attorney.[2] A restrictive application of these local bar rules would enable company counsel to control the government's access to the company's employees, whose statements or acts or omissions could bind the corporation under the Federal Rules of Evidence and the expansive view of *respondeat superior*.[3] In that way, company counsel have attempted to thwart meaningful contact between the government and the individual employee and have, in a very real sense, created an obstacle to the ability of the employee to communicate freely with law enforcement officials, as mandated by the False Claims Act.[4]

The Department's policy has been formed slowly, but consistently for several years. In April 1980, the Office of Legal Counsel issued a memorandum that concluded that attorneys for the government and law enforcement officers are limited only by federal constitutional and statutory provisions in carrying out their duties. Beyond that, the memorandum concluded, the extent to which the Department requires its attorneys to conform their conduct to judicial and bar association interpretations of DR 7–104 is solely a question of policy.

The FBI followed by issuing an airtel dated August 11, 1980, to all special agents in charge, instructing them to avoid discussion of pending charges against a represented defendant without prior notification and consent of counsel. The letter, which addresses only post-indictment contacts, noted three exceptions to the general practice: (1) when the represented defendant initiated the contact and the agents informed him of his right to obtain separate counsel; (2) when the represented defendant continued to engage in criminal conduct other than that for which he was under indictment, in which case the agents were to avoid discussion of pending charges; and (3) when an interview was necessary to obtain information critical to the safety of life, such as the location of a kidnap victim, and there was a substantial reason to believe that the presence of counsel would impede the flow of such information. The airtel remains policy today.

Deputy Attorney General Schmults also stated the Department's belief that it is appropriate for an attorney to communicate with a represented defendant who initiates communication if the defendant is advised he may have separate counsel. The Executive Office for United States Attorneys circulated DAG Schmults' statement as Department policy on communications with represented defendants. *See* "United States Attorney's Bulletin," Vol. 30, No. 4, p. 73 (February 19, 1982).

In his letter to the District of Columbia Bar, then Deputy Attorney General Burns stated that Justice Department attorneys are "required and expected" to comply with ethical rules, and that "[a]s a practical mat-

---

**2.** It is easy to see that the effect of applying 7–104 in this context would often be to prevent Department attorneys from having any meaningful contact with such employees during the investigative phase of a civil case. The mere notification of a company of an intention to talk to its employee can result in the company putting pressure on the employee not to talk. If the employee is interviewed, the presence of company counsel is a significant deterrent to the employee's coming forward with any information damaging to the company.

**3.** *See e.g. American Society of Mechanical Engineers, Inc. v. Hydrolevel*, 456 U.S. 566 (1982).

**4.** The "whistleblower protection" provision of the Act, 31 U.S.C. Section 3730(h), was enacted to encourage individual employees to assist False Claims Act investigations and provides certain protection to those who do so.

ter, we expect that the obligations of federal attorneys in carrying out their federal duties will rarely if ever preclude compliance with state or local ethical requirements." DAG Burns concluded, however, that in the "rare instance where an actual conflict arises," the Supremacy Clause forbids the states from regulating the attorneys' conduct in a manner inconsistent with their federal responsibilities, as determined by federal law and the Attorney General.

It is the clear policy of the Department that in the course of a criminal investigation, an attorney for the government is authorized to direct and supervise the use of undercover law enforcement agents, informants, and other cooperating individuals to gather evidence by communicating with any person who has not been made the subject of formal federal criminal adversarial proceedings arising from that investigation, regardless of whether the person is known to be represented by counsel.

It is further the policy and the experience of the Department that what it may do in an undercover setting, it may similarly do overtly. Routine contacts with witnesses, even when not done undercover, are an integral part of federal law enforcement, even where a lawyer may represent the witness. Traditionally, local bar rules have not been thought to prohibit such contact, and any attempt to use the rules in this way runs afoul of the Supremacy Clause.

Finally, any rule that would permit nonattorney investigators or informants to contact represented parties, but not at the direction of an attorney supervisor, is an invitation to those nonattorneys to avoid seeking direction from the responsible prosecutors and civil lawyers. The Department does not endorse any policy that rewards investigative techniques that must be hidden from the responsible attorneys.

As a practical matter, Department attorneys are encouraged to be sensitive to the interests that are sought to be protected by DR 7-104. To this end, the Department has developed some general practices when

contact is to be made with represented individuals.

In the context of Organized Crime cases, the Department has typically taken the individual seeking access to the prosecutor or the investigators before a court, and counsel is appointed for the individual. This procedure, if available, obviously protects the interests of the individual in providing him or her the benefit of legal advice while not triggering any dire consequences from advertising his or her cooperation.

Frequently, in "corporate" settings, where one lawyer claims to represent the interests of all the employees, an employee who seeks to communicate with the investigators or with Department attorneys is willing to advise the lawyer that he does not want representation, and in that case, the individual is not represented within the meaning of DR 7-104. In such a case, communication with the unrepresented individual cannot conceivably be contrary to any local rule.

In the case that the individual wants to avoid confrontation with the attorney that purports to represent his interests, Department attorneys can encourage him or her to consult with alternative counsel or may seek to have other counsel appointed, as in the Organized Crime context. Often, in these situations, the individual's desire not to confide in the third-party's attorney or to confront that attorney is due to his or her perception of a conflict of interest. Where that conflict is real and apparent, Department attorneys should consider asking the attorney to disqualify himself or herself, and should move to disqualify the attorney if appropriate.

A frequent and difficult situation is where a corporation has counsel continuously on retainer, which counsel claim to represent all employees on all corporate matters, while investigators want to interview several employees, who may not even be aware that a lawyer purports to represent them. It is difficult to conceive that a true attorney client relationship has developed between the attorney and the employee on the matter under investigation, as the attorney is unaware of the matter and the

employee is unaware of the attorney. This alone would seem to militate against the relevance of DR 7–104. Nevertheless, the defense bar argues that such communications may violate the disciplinary rule. It is the Department's position, in such an instance, that where the Constitution and federal law permit legitimate investigative contact, DR 7–104 does not present an obstacle.

Attorneys and agents conducting such interviews, as opposed to undercover contacts, should begin by advising the individual that an attorney has purported to represent him or her, and that the individual is free to utilize the attorney. If the individual consents to further interviews and states that he or she does not want the "third party" attorney present because he or she does not believe that the attorney will not represent his or her interests, DR 7–104 does not prohibit further contact.

In sum, it is the Department's position that contact with a represented individual in the course of authorized law enforcement activity does not violate DR 7–104. The Department will resist, on Supremacy Clause grounds, local attempts to curb legitimate federal law enforcement techniques.

In the near future, the Department will codify language in the Standards of Conduct, 28 C.F.R., Part 45, that will make the Department's position clear to the bench and bar. We intend to make clear that the "authorized by law" exemption in DR 7–104 applies to all communications with represented individuals by Department attorneys or by others acting at their direction. The Department also anticipates that the language will clarify that the Supremacy Clause will continue to provide Department attorneys and agents with adequate assurances that the United States will support them if any disciplinary authority other than the United States attempts to interfere with the legitimate investigative prerogatives of the government. The Department anticipates that the provision will appear substantially as follows:

In the course of investigating and prosecuting violations of federal criminal law and investigating and litigating civil enforcement matters, law enforcement officers, including Department of Justice attorneys, and those acting at their direction often have occasion to contact or communicate with individuals represented by counsel. Such contacts or communications are an important element of effective law enforcement. Accordingly, an attorney employed by the Department, and any individual acting at the direction of that attorney, is authorized to contact or communicate with any individual in the course of an investigation or prosecution unless the contact or communication is prohibited by the Constitution, statute, Executive Order, or applicable federal regulation.

As part of the ongoing process of ensuring that DR 7–104 cannot be invoked to cripple federal investigative techniques, and to provide a consistent source to articulate and to implement the policy of the Department in this area, Edward S.G. Dennis, Jr., Assistant Attorney General, Criminal Division, will be available to provide advice and assistance in determining if a particular contact with a represented person is consistent with the policies of the Department. Any questions about contacting represented parties should be referred to:

Edward S.G. Dennis, Jr.

Assistant Attorney General

Criminal Division

FTS 633–2601

All supervisory attorneys should ensure that all Department attorneys are aware of the position articulated in this Memorandum and the availability of advice and assistance in the Department.